MARCEL and BEVERLY BOURQUE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CUMAR CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bourque v. Commissioner
Docket Nos. 4507-76, 7125-77, 1554-78, 1555-78.
United States Tax Court
T.C. Memo 1980-286; 1980 Tax Ct. Memo LEXIS 300; 40 T.C.M. (CCH) 824; T.C.M. (RIA) 80286; July 31, 1980, Filed Moses Kando, for the petitioners. Daniel P. Ehrenreich and Pamela V. Gibson, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies and additions to tax in respect of petitioners' 1968, 1969, and 1970 income taxes as follows: Marcel and Beverly Bourgue
Addition to Tax,
Docket
Sec. 6653(b),
No.
Year
Deficiency
I.R.C. 1954
1554-78
1968
$ 62,838.10
$31,419.05
4507-76
1969
106,468.41
53,234.20
7125-77
1970
6,327.47
3,163.74
Cumar Co., Inc., Docket No. 1555-78
Additions to Tax,
I.R.C. 1954
Year
Deficiency
Sec. 6653(b)
Sec. 6655
1968
$50,662.43
$25,331.22
$162.59
1969
85,547.17
42,773.59
928.55
1970
5,714.80
2,857.40
*302 The principal matter in issue in respect of the individual petitioners is whether their taxable income derived from the corporate petitioner was understated during each of the taxable years and whether a portion of any underpayment of tax is attributable to fraud. A threshhold question as to the corporate petitioner is whether its petition should be dismissed for lack of jurisdiction by reason of forfeiture of its charter in 1972. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners Marcel and Beverly Bourque, husband and wife, were residents of Massachusetts when their first petition was filed, and were residents of Rhode Island when their other two petitions were filed. The controversy herein relates to the income and expenses of a business conducted either individually or through a corporation by Marcel Bourque, who will sometimes herein-after be referred to as "petitioner". Petitioner Cumar Co., Inc. (Cumar), was organized as a Rhode Island corporation on August 7, 1968, for the purpose of "[purchasing] and selling high purpose alloys and other metallic products". *303 Petitioner and Mrs. Bourque were its sole shareholders, each owning 100 shares. During the taxable years, petitioner was Cumar's president and treasurer, as well as its sole employee. Mrs. Bourque was also an officer of the corporation, but performed no duties. Cumar's principal place of business was Providence, Rhode Island, during the taxable years. On December 31, 1972, Cumar's corporate charter was forfeited to the State of Rhode Island. Marcel Bourque filed Cumar's petition herein on February 15, 1978. During the taxable years 1968 through 1970, petitioner was engaged in the business of buying and selling scrap precious metals. He started in the business in 1949 as an employee of his father's company, State Line Scrap Co., and received some wages from this company in 1968. The total wages reported on petitioners' 1968 return amounted to $1,225. During the period from May to August 1968, petitioner operated as a sole proprietor under the names of Associated Industrial Sales and Associated Industrial Sales, Inc. After Cumar was incorporated on August 7, 1968, and throughout the remainder of the years involved herein, petitioner conducted his business through Cumar. *304 In his business as a dealer in precious metals, [1] petitioner would bid to purchase the scrap metal remaining from the operations of manufacturers and fabricators of products using precious metals. He occasionally purchased machinery for resale. It was petitioner's custom to pay for purchases in cash, although he sometimes used checks to pay for purchases of scrap. However, petitioner did not always pay for the scrap before he removed it from the seller's premises, since it would at times be necessary to sort, weigh, and identify the scrap. After purchasing the metal, petitioner would sell it to refiners who would then melt and purify the metal for resale. Since he had no storage facilities, petitioner did not keep an inventory of scrap metals, and attempted to arrange their resale immediately after purchase. Metal refiners would pay petitioner by check, and after the incorporation of Cumar the payee was generally either Cumar or both Cumar and the petitioner. In some instances, petitioner was the only payee. Petitioner *305 frequently cashed these checks, although he sometimes deposited them in Cumar's checking account. Petitioner would then use the proceeds or some portion thereof to purchase more scrap, although he often retained some of the proceeds for his personal use. Cumar never formally declared any dividends, nor did it purport to pay petitioner any wages or salary for his services. However, petitioner did receive "commissions" from Cumar. Such commissions were not based on a percent-age of sales, nor were they computed on the basis of any fixed formula. Instead, petitioner would simply withdraw cash from the corporation from time to time, and would call such withdrawals "commissions". Petitioner would also occasionally write checks on Cumar's bank account for personal expenses, and these payments were sometimes accounted for as "commissions". At other times petitioner used corporate funds for his own purposes and drew checks on the corporate bank account for personal reasons without designating such amounts as commissions. On December 3, 1964, petitioner was discharged in bankruptcy. The Bourques had a 1965 Federal income tax liability in the amount of $682.33, which was discharged *306 in part by a series of $50 payments over the period October 1966 to August 1967, and finally paid in full in July and August 1968. The Bourques' 1966 joint Federal income tax return disclosed "total income" of $4,330.18, and claimed five exemptions. Their 1967 joint Federal income tax return disclosed "total income" of $5,837.54, and again claimed five exemptions. During the taxable years petitioner did not receive any gifts or inheritances or any large loans, with the exception of a $25,000 mortgage loan. This loan was obtained in October of 1968 when the Bourques purchased a new home in Barrington, Rhode Island. The $7,000 balance of the purchase price was paid by them at the time of the purchase, $1,000 of which was paid by a check drawn on Cumar's bank account. Mr. and Mrs. Bourque were also involved in the operation of at least two other business entities during some of the taxable years. Petitioner is president and Mrs. Bourque is treasurer of a corporation called Crayle Realty Corp. Mrs. Bourque opened a checking account for Crayle Realty Corp. on December 5, 1969, with an initial currency deposit of $20,000. As of December 31, 1970, petitioners' capital investment *307 in this corporation amounted to $21,500. Also, on May 11, 1970, petitioner formed the Winthrop Investment Corporation, of which Mr. and Mrs. Bourque were the sole shareholders. Petitioner invested $30,000 in this corporation, which purchased an ocean front motel complex on May 28, 1970. The purchase price of the motel was $72,000; $30,000 was paid in cash, and payment of the balance was secured by a mortgage held by the sellers. Mr. and Mrs. Bourque and Cumar utilized the services of professionals in preparing their income tax returns. Cumar filed no returns for its taxable years 1968 and 1969. At some time prior to April 12, 1971, petitioner retained Mr. Frank DeAngelis, a revenue agent for the State of Rhode Island and part-time public accountant, to prepare 1969 and 1970 returns for Cumar. Mr. DeAngelis also prepared the Bourques' 1970 individual income tax return. Mr. DeAngelis prepared such returns and gave them to petitioner, who filed the 1970 Cumar return, but failed to file the 1969 Cumar return. In preparing the returns, Mr. DeAngelis was supplied with Cumar's bank statements, bank deposit slips, checks, and checkbook stubs. He inquired of petitioner as to the *308 existence of any other records, and was told that there were none. Petitioner did keep a "Dome" record book from May of 1968 through March of 1969 which recorded some disbursements by check and listed various receipts; this book was not given to Mr. DeAngelis. Furthermore, the book does not provide an adequate record of petitioner's receipts as a sole proprietor or of Cumar's receipts; the total receipts shown in the "Dome" book are less than the stipulated receipts. In preparing the returns, Mr. DeAngelis determined Cumar's receipts and disbursements solely on the basis of activity in the corporation's checking accounts. He was not supplied with any purchase invoices for scrap purchases. Mr. DeAngelis classified Cumar's expenses on the basis of notations made by petitioner on most of the check stubs, which are in the record. From these notations, which purported to identify the purposes for the issuance of the corresponding checks, he determined the amounts allocable to petitioner as commissions and also classified the other expenditures by the corporation into various categories of deductible expenses. Mr. DeAngelis also classified the receipts of Cumar by reference to similar *309 notations made by petitioner on Cumar's deposit slips. These notations identified deposits, most of which were made in currency, as "loan" or proceeds from the sale of "scrap". However, the record contains only the deposit slips for 1970; deposit slips for 1968 and 1969 are not in the record.
On its 1970 corporate income tax return, Cumar reported the following income and expenses for that year: Gross receipts
$6,137.44
Cost of goods sold
1,156.87
$ 4,980.57
Commissions
$5,942.67
Other expenses
7,118.64
(13,061.31)
Taxable income (loss)
($8,080.74)
The parties have stipulated that Cumar had the following gross receipts, most of which are evidenced by various checks payable to Cumar or petitioner: Year
Gross receipts
1968
$122,609.02
1969
214,935.59
1970
45,084.23
The stipulation thus establishes that Cumar had unreported gross receipts in 1970 of $38,946.79. The unfiled 1969 return prepared from Cumar's bank records listed Cumar's gross receipts as $78,005.25; Cumar's records thus understated gross receipts for 1969 by $136,930.34. The discrepancies between Cumar's records and Cumar's actual gross receipts *310 are the result of two of petitioner's business practices. Petitioner frequently cashed checks received by Cumar, rather than depositing the check directly in Cumar's bank account. Such undeposited checks amounted to $17,084.24 in 1968 and at least $126,660.09 in 1969. In 1970, only one check, in the amount of $2,400, was deposited directly in Cumar's bank account. The remaining checks received by Cumar in 1970, amounting to $42,684.23, were cashed. Although some of the cash proceeds from these checks in all three years may have been subsequently deposited in Cumar's checking account, the deposit slips in the record for 1970 total only $22,611.21. For 1969, the cash receipts summary prepared by Mr. DeAngelis shows deposits to Cumar's bank account of only $77,969.44. The record does not contain any materials from which the precise amount of Cumar's 1968 bank deposits can be ascertained. Accordingly, since petitioner supplied Mr. DeAngelis with no records other than bank records, Cumar's gross receipts were understated at least to the extent that the proceeds of checks cashed by petitioner were not deposited in the corporation's checking account. Furthermore, petitioner incorrectly *311 identified the nature of at least some of the receipts deposited in Cumar's checking account. [2] The deposit slips for Cumar's checking account for 1970, substantially all of which appear to be in the record, show only $6,766.21 [3] as receipts from the sale of scrap; deposits totaling $15,845 are identified as ["loans]". The records supplied to Mr. DeAngelis for the preparation of Cumar's returns, including the check stubs for all of Cumar's checking accounts, also were not accurate, at least to some extent, in their classification of Cumar's expenditures. The evidence is insufficient to determine whether petitioner's notations in Cumar's checkbooks in 1970 *312 accurately describe the nature of Cumar's expenditures. However, the evidence does establish that expenditures were falsely described in numerous instances in 1968 and 1969. Cumar checks totaling $5,061.85 [4] were issued to pay a wide variety of personal expenses of Mr. and Mrs. Bourque in 1969. The stubs for these checks all bear the notation "scrap", notwithstanding that the checks represented personal expenditures of the Bourques for clothing, shoes, appliances, a sterling silver serving set, encyclopedias, furniture, meat products, [5] and other sundry items. Likewise, it has been stipulated that Cumar issued checks in 1968 for various personal expenses of Mr. and Mrs. Bourque. The total of such checks is $2,415.02, [6] and the corresponding check stubs similarly bore the notation "scrap", with two exceptions; one stub relating to a check issued for a Speed Queen washer bears the notation "office [supply]", and a stub recording payment of closing costs on the Bourque's personal residence bears the notation "[legal] [expense]". *313 At some time, the Internal Revenue Service Intelligence Division conducted an investigation of Marcel Bourque. In April of 1972, Special Agent Nathan Katz interviewed petitioner in the presence of petitioner's counsel. At that interview, petitioner made several misstatements of fact. Petitioner stated that he derived all his income in 1968, 1969, and 1970 from employment by his father and by Cumar, and indicated that he did not conduct business as an individual. However, as previously found and as appears in the stipulation of the parties, petitioner operated for some three months in 1968 as a sole proprietor doing business as Associated Industrial Sales or Associated Industrial Sales, Inc., and had gross receipts in the amount of $13,976.40 from such activities.Petitioner also represented to Agent Katz that all of Cumar's receipts were deposited in Cumar's bank accounts, contrary to findings above that substantial receipts, at least in 1969 and 1970, were not deposited in the corporation's bank accounts. Agent Katz also advised petitioner that the IRS had learned that he made sales of scrap to at least four companies, Handy & Harman, Kelley Metals Corporation, State Line General *314 Scrap Co., Inc., and Eastern Foundry Supplies, Inc., and asked petitioner if Cumar sold scrap to any other companies. Petitioner responded that no sales had been made to other companies; but there were in fact five other companies which in the aggregate made extensive purchases from Cumar during the three-year period 1968 through 1970. Cumar's sales to those five undisclosed customers produced gross receipts in the aggregate amount of $235,514.57. At the interview with Agent Katz, petitioner declined to reveal the names of persons from whom he purchased scrap because he allegedly did not "want to get them into trouble." At the time of the trial, petitioner purported to be unable to recall the names of any persons from whom he purchased scrap metal in 1968, 1969 or 1970. After the IRS investigation, petitioner was indicted by a Federal Grand Jury on March 6, 1975, on the charge of wilfully failing to file Cumar's corporate income tax return for its taxable year 1969, in violation of section 7203, Internal Revenue Code of 1954. Following a jury trial, petitioner was found guilty by the United States District Court for the District of Rhode Island, and *315 the judgment of conviction as to 1969 was affirmed by the United States Court of Appeals for the First Circuit. [7]United States v. Bourque, 541 F. 2d 290 (1st Cir. 1976). Moses Kando, Esq., petitioners' counsel herein, prepared petitioners' 1968 and 1969 joint individual income tax returns. However, there is no evidence to indicate what records petitioner supplied Mr. Kando or the precise extent of his services in those years. The 1970 return was prepared by Mr. DeAngelis, *316 in part through utilization of the Cumar records supplied by petitioner. The following schedule reflects the income reported by Mr. and Mrs. Bourque on their joint 1968, 1969, and 1970 income tax returns: 1968
1969
1970
Wages
$ 1,225.00
$ $ Commissions as
scrap metal
salesman
10,997.07
11,238.00
12,892.73 [8]
Adjusted gross income
$12,222.07
$11,238.00
$12,892.73
None of these returns reported any dividend income from Cumar or any other corporation in which Mr. and Mrs. Bourque had an interest. The Commissioner issued a notice of deficiency to Cumar on November 14, 1977. This notice determined Cumar's taxable income for its taxable years 1968, 1969, and 1970 in accordance with the following schedule: 1968
1969
1970
Gross receipts
$122,609.02
$214,935.59
$45,084.23
Commissions
11,651.62
Cost of Sales and
Other Business
Expenses
13,115.78
39,372.76
8,275.51
Taxable income
$109,493.24
$175,562.82
$25,157.10
The Commissioner's determination of Cumar's gross receipts *317 is precisely in accord with the stipulation of the parties. Furthermore, the amount of petitioner's commissions income for 1970 has been stipulated, and this figure corresponds to the amount allowed Cumar as a deduction for commissions paid in 1970. The deficiency notice issued to Cumar does not include separate adjustments for commissions for 1968 and 1969. However, Government counsel stated at trial, without objection from the petitioners' counsel, that the Commissioner had allowed the corporation a deduction for the amounts petitioner had described as commissions in Cumar's records.These commissions, which are stipulated to be $4,275 in 1968 and $12,992.63 in 1969, are therefore presumed to be incorporated in the above schedule as part of the item identified as "Cost of Sales and Other Business Expenses" for 1968 and 1969. Thus, the parties' only remaining disagreement in respect of Cumar's taxable income is whether Cumar's Cost of Sales and Other Business Expenses were in excess of the amounts shown above. In three separate notices of deficiency, the Commissioner redetermined petitioners' adjusted gross income as follows: 1968
1969
1970
Gross receipts as
sole proprietor $13,976.40
Less cost of sales
& other expenses 2,247.89
$11,728.51
Wages
1,225.00
Commissions
4,875.00
$ 12,992.63
$11,651.62
Cumar dividends
(net of exclusion
and adjustments)
109,158.12
173,898.43
22,263.02
Adjusted gross income
$126,986.63
$186,891.06
$33,914.64
*318 The petitioner's stipulated unreported gross receipts as a sole proprietor in 1968 are in accord with the above determination. Likewise, the stipulation indicates that the above figures correctly reflect petitioner's commission income. [9] The only disagreement between the parties as to the above determination is whether the petitioner received constructive dividends from Cumar in the amounts determined by the Commissioner. [10]
OPINION 1. Jurisdiction over Cumar. Cumar's charter was forfeited *319 [11] December 31, 1972, but its petition herein was filed some five years thereafter. We accordingly must decide whether Cumar has the capacity to litigate in this Court. Pursuant to Rule 60(c), Tax Court Rules of Practice and Procedure, this determination must be made in accordance with the law under which the corporation was organized, in this case, the law of the State of Rhode Island. See Brannon's of Shawnee, Inc. v. Commissioner, 71 T.C. 108, 111 (1978); Dillman Bros. Asphalt Co. v. Commissioner, 64 T.C. 793, 795 (1975); Great Falls Bonding Agency v.Commissioner, 63 T.C. 304, 306 (1974). *320 The Rhode Island statutes provide that corporations whose existence is terminated [12] shall remain in existence for a period of two years for the purpose of winding up their affairs. [13] Corporations which have been dissolved also retain the capacity to utilize the courts to resolve claims or liabilities incurred prior to dissolution of the corporation, but only if an "action or other proceeding" is commenced within two years of the dissolution of the corporation. [14]
*321 Our reading of the relevant statutory provisions indicates that Cumar was no longer in existence for any purpose at the time its petition was filed and accordingly lacked capacity to petition this Court. Both of the relevant Rhode Island statutory provisions extend the lives of dissolved corporations for certain purposes for two years.The deficiency notice to Cumar was not issued until November 14, 1977, and the petition filed on Cumar's behalf was not filed until February 15, 1978. Corporations that forfeit their charter are granted continued existence for two years by the statute, R.I.Gen. Laws sec. 7-1.1-98.1, supra note 13, and our attention has not been directed to any other statutory provisions which would extend this time. After the forfeiture of its charter and the expiration of the two-year "winding up" period, the corporation no longer exists to perform any activities, [15] and accordingly lacks the capacity to petition this Court. Cf. Padre Island Thunderbird, Inc. v.Commissioner, 72 T.C. 391, 395-398 (1979); Condo v. Commissioner, 69 T.C. 149, 151-152 (1977). *322 Furthermore, to the extent that R.I. Gen. Laws sec. 7-1.1-98, supra note 14, would have allowed Cumar to maintain an action after its termination, this provision is inapplicable here because no "action or other proceeding" of any sort was pending or initiated within the two-year period provided by the statute. [16]We accordingly must dismiss Cumar's petition for lack of jurisdiction. [17] The parties are in agreement that Cumar is not properly before the Court. *323 2. Amount of Unreported Income. In determining the deficiencies against the individual petitioners the Commissioner proceeded on the assumption that substantially all of Cumar's earnings found their way into Mr. Bourque's hands or were expended on behalf of the petitioners, and that such earnings must therefore be treated as having been distributed as dividends to the Bourques. Petitioners do not argue that Cumar's earnings remained undistributed with the corporation, if in fact Cumar had earnings in the amounts determined by the Commissioner.Rather, their principal contention is that Cumar did not have earnings in the amounts determined by the Commissioner. The starting point for computing Cumar's earnings is the amount of the corporation's gross receipts for each of the years 1968, 1969, and 1970. Fortunately, these amounts have been stipulated by the parties, and they are greatly in excess of what appeared in Cumar's records or were reported in Cumar's 1970 return (the only return filed on its behalf for the three-year period). Petitioners could hardly have avoided stipulating to the amounts received by the corporation, since the purchasers of scrap from Cumar paid *324 by check, and the Government was thus able to ascertain the precise amounts received by Cumar each year. In determining Cumar's earnings, it became necessary for the Commissioner to subtract the cost of goods sold as well as commissions and other business expenses from Cumar's gross receipts. The amount of commissions has been stipulated for each of the years, and there is no dispute that the Commissioner allowed deductions in respect thereof. He also subtracted further amounts as "Cost of Sales and Other Business Expenses" in arriving at Cumar's "taxable income", which he treated as Cumar's earnings. [18]
Petitioners do not point to a single expense which they claim that the Commissioner failed to take into account, nor did they furnish any evidence of the cost of scrap. They *325 argue only generally that Cumar's profit on sales of scrap was merely about "10 percent". Petitioners' sole evidence in this respect was Mr. Bourque's self-serving, conclusory testimony, but, as pointed out more fully hereinafter, we did not find him to be a credible witness. Petitioner testified that he received no formal dividends from Cumar and properly reported as "commissions" all cash withdrawals and corporate payments of his personal expenses. However, the absence of formal dividend declarations by the corporation does not prevent a stockholder from being charged with the receipt of dividends. See Clarkv. Commissioner, 266 F. 2d 698, 711-712 (9th Cir. 1959); Barbourville Brick Co. v. Commissioner, 37 T.C. 7, 13 (1961). Petitioner's testimony as to his handling of his personal expenses paid by the corporation was less than convincing. The parties stipulated that the corporation paid substantial amounts of petitioners' personal expenses in 1968 and 1969, and petitioner made entries on the corporation's check stubs characterizing these payments *326 as corporate business expenses. These corporate expenditures for the benefit of Cumar's only shareholders, Mr. and Mrs. Bourque, constitute dividends to them. See Benjamin v. Commissioner, 66 T.C. 1084, 1115 (1976), affd. 592 F. 2d 1259 (5th Cir. 1979); Challenge Mfg. Co. v.Commissioner, 37 T.C. 650, 663 (1962). Furthermore, we did not find petitioner's testimony convincing as to his handling of cash withdrawals from the corporation. He had complete control of the corporate checking account and frequently made checks payable to cash or to himself. He also cashed checks received from corporate sales and retained the proceeds. Many corporate receipts never found their way into the corporation's bank accounts and no records were maintained as to the use of such receipts. Moreover, given petitioner's overall pattern of poor and misleading record keeping, we do not find persuasive his suggestion that all corporate checks made payable to cash were used by him for the purchase of scrap. In the circumstances, the Commissioner was justified in determining that petitioner received dividend income to the extent that corporate earnings *327 were not shown to be retained by the corporation or used by petitioner for corporate purposes.See Estate of Clarke v. Commissioner, 54 T.C. 1149, 1160 (1970); Chesbro v. Commissioner, 21 T.C. 123, 129 (1953), affd. 225 F. 2d 674 (2d Cir. 1955), cert. denied 350 U.S. 995 (1956). In attempting to prove that they had not received any dividends, or at least that the amounts thereof were substantially less than those charged to them by the Commissioner, petitioners contend that Cumar's average profit on sales, exclusive of commissions, was only "10 percent". [19] We have already indicated that we did not believe petitioner's testimony to this effect. His testimony over the course of the trial was evasive and contradictory. Furthermore, he has consistently refused to come forward with any further evidence of his cost of sales and has even refused to provide the Government with the names of persons from whom he purchased scrap precious metal. Moreover, we found incredible his testimony that he could not remember the identity of even a single vendor of the scrap. His recalcitrance in this respect, his distinctly slective *328 recollection as a witness, and his failure to keep adequate records strongly suggest that Cumar's profit margins were substantially higher than "10 percent". Also, taking into account petitioner's December 1964 bankruptcy and the evidence as to the modest amount of petitioners' income for the years 1965-1967, as well as the absence of any convincing evidence as to gifts, inheritances, loans, or other nontaxable receipts which could have served as the source for some of their disproportionately large expenditures during the tax years, [20] we are confirmed in our conclusion that petitioners had unreported taxable income during the years in issue, 1968-1970. Although we are satisfied that petitioners have not carried their burden of proving that the Commissioner erred in attributing unreported dividend income to them in each of the years at issue, we are also convinced that the amounts charged to them *329 by the Government are excessive. The evidence does persuade us that there were some undocumented purchases of scrap for cash on Cumar's behalf that must be taken into account in determining Cumar's earnings. We are thus faced with what at first blush may appear to be a dilemma: we do not believe petitioner's testimony that Cumar's earnings were only "10 percent", nor can we accept the Government's position in toto that all of Cumar's receipts minus the commissions and certain vaguely identified adjustments constitute its earnings, substantially all of which must be attributed to petitioners as dividends. The correct result is somewhere in between these two extremes. The record does not afford us any scientific basis for reaching a precisely accurate result and we must do the best we can with the materials at hand. Cf. Cohan v. Commissioner, 39 F. 2d 540, 543-544 (2d Cir. 1930); Lollis v. Commissioner, 592 F. 2d 1189, 1190-1191 (9th Cir. 1979). We have on occasion been confronted with comparable situations in the past where we could not accept the extreme position of either party and achieved a practical solution by making a finding to the best *330 of our ability on the basis of the record involved. Cf. Fall River GasAppliance Co. v. Commissioner, 42 T.C. 850, 857 (1964), affd. 349 F. 2d 515, 517 (1st Cir. 1965); Ach v. Commissioner, 42 T.C. 114, 126-127 (1964), affd. 358 F. 2d 342, 344-345 (6th Cir.), cert. denied 385 U.S. 899 (1966); Potson v. Commissioner, 22 T.C. 912, 929 (1954), affd. subnom. Bodoglau v.Commissioner, 230 F. 2d 336, 340-341 (7th Cir. 1956); Pleasonv. Commissioner, 22 T.C. 361, 370-371 (1954), affd. 226 F. 2d 732, 733-734 (7th Cir. 1955), cert. denied 350 U.S. 1006 (1956). Accordingly, using our best judgment on the materials before us, we hereby find that Cumar's actual costs for its scrap purchases plus its business expenses, exclusive of commissions, were 35 percent of its gross sales, with the consequence that its taxable earnings and profits must be recomputed to reflect this finding. And since there is no dispute between the parties in respect of the distribution of Cumar's earnings, properly determined, the amount *331 of dividends chargeable to petitioners may be computed accordingly. 3. Fraud.The Commissioner found that all or part of the underpayments in tax by petitioners for each year was due to fraud, and determined that they were accordingly subject to the 50 percent addition to tax provided by section 6653(b), I.R.C. 1954. The Commissioner bears the burden of proof on this issue, and must establish by clear and convincing evidence that some portion of the underpayment for each year was due to fraud. Sec. 7454(a), I.R.C. 1954; Rule 142(b), Tax Court Rules of Practice and Procedure; Worcester v. Commissioner,370 F. 2d 713, 717 (1st Cir. 1966); Green v. Commissioners,66 T.C. 538, 549 (1976). In order to prove fraud, the Government must demonstrate that the petitioners intended to evade taxes known or believed to be owing. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Danenberg v. Commissioner,73 T.C. 370, 393 (1979). *332 However, it need not prove the exact amount of the underpayment attributable to fraud; it is sufficient that the Government shows that any part of the underpayment is the product of fraud. Loftin & Woodward, Inc. v. United States,577 F. 2d 1206, 1236 (5th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Once the existence of a deficiency and fraud are established, the 50 percent addition to tax is applied to the entire amount of the deficiency. See Rexach v. United States,482 F. 2d 10, 32 (1st Cir.), cert. denied 414 U.S. 1039 (1973); Stone v. Commissioner,56 T.C. 213, 220-221 (1971). Fraud may be inferred from "any conduct, the likely effect of which would be to mislead or to conceal". Spies v. United States,317 U.S. 492, 499 (1943). There is ample evidence of such conduct on the part of Marcel Bourque for all three taxable years. "Consistent and substantial [understatements] *333 of income" are indicative of fraud. Foster v. Commissioner,391 F. 2d 727, 733 (4th Cir. 1968). See Holland v. United States,348 U.S. 121, 139 (1954); Lollis v. Commissioner,supra, 595 F. 2d at 1191; George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964).We find that petitioner substantially understated his income in each of the taxable years. [21] The gross receipts from the sale of scrap have been stipulated, and they are substantially in excess of the amounts reported. It is uniformly the rule, even in criminal tax evasion cases where the Government bears the greater burden of proof beyond a reasonable doubt, "that evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any." Siravo v. United States,377 F. 2d 469, 473 (1st Cir. 1967). See, e.g., United States v. Hiett,581 F. 2d 1199, 1202 (5th Cir. 1978); United States v. Nathan,536 F. 2d 988, 991 (2d Cir.), cert. *334 denied 429 U.S. 930 (1976); United States v. Shavin,320 F. 2d 308, 310-312 (7th Cir.), cert. denied 375 U.S. 944 (1963); Beck v. United States,298 F. 2d 622, 632-633 (9th Cir.), cert. denied 370 U.S. 919 (1962); United States v. Bender,218 F. 2d 869, 871-872 (7th Cir.), cert. denied 349 U.S. 920 (1955). Petitioner has failed to come forward with credible evidence to fully neutralize the effect of his unreported receipts. To be sure, petitioner claims that he used cash received from Cumar to purchase scrap precious metal. However, his testimony in this respect was not entirely credible. Although we believe that he used some of the cash for that purpose, we are left with a definite conviction that his testimony was false to the extent that it suggested or implied that he had thus used all of the cash. We are satisfied that *335 he in fact retained substantial amounts of the cash for himself, amounts that were considerably in excess of his reported income. Moreover, during the taxable years, petitioners made cash investments amounting to more than $50,000, a sum well in excess of what was available to them from their reported gross income, and other known resources during the taxable years. In attempting to explain the source of a portion of these funds on cross examination, petitioner claimed that $20,000 came as a loan; this flatly contradicted his earlier testimony that he received no loans, gifts, or inheritances during the years involved. See also note 20, supra. Petitioner's testimony was wholly inadequate to explain the disposition of the stipulated receipts of the scrap enterprise, and, based on our evaluation of all the evidence, we find that petitioner retained substantial amounts of income from Cumar which he failed to report. [22] Such substantial omissions of income are persuasive evidence of fraud. *336 Additional indicia of fraud are provided by petitioner's false records and false reprsentations to his accountant. In 1968 and 1969, Cumar made expenditures for the benefit of petitioner which were falsely recorded on Cumar's check stubs as corporate business expenses. False book entries that conceal income are evidence of fraud. See, e.g., Arctic Ice Cream Co. v. Commissioner,43 T.C. 68, 74 (1964); Chesbro v. Commissioner,supra,21 T.C. at 130.Cf. Worcester v. Commissioner,supra,370 F. 2d at 717. Also, petitioner made false representations to the accountant who prepared his 1970 return. Petitioner directed the accountant, Mr. DeAnegelis, to prepare the return on the basis of Cumar's bank records, although petitioner knew that large sums were not shown in these records because of his practice of cashing Cumar's sales checks and not depositing the proceeds. False or incomplete representations to return preparers are indicative *337 of fraud. See Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962); Farber v. Commissioner,43 T.C. 407, 420, modified 44 T.C. 408 (1965).Cf. Estate of Temple v. Commissioner,67 T.C. 143, 161-163 (1976). Petitioner's failure to cooperate with the IRS during its investigation of his tax liability is also relevant in determining whether the deficiency is the product of fraud. Lord v. Commissioner,525 F. 2d 741, 748 (9th Cir. 1975), revg. in part and affg. in part 60 T.C. 199 (1973). Petitioner told Agent Katz that he did not conduct business as an individual in 1968, 1969, or 1970, that he deposited all of Cumar's receipts in Cumar's bank accounts, and that he had made no sales to companies other than those identified by the IRS. All of these statements were lies. Moreover, petitioner has refused to provide the IRS with any records of scrap precious metal purchases or the names of any persons from whom he purchased scrap and persisted in this refusal at trial. We do not believe his testimony that he could not remember the names of any of them. Such conduct is persuasive *338 evidence of a continuing scheme to conceal petitioner's taxable income. See McGee v. Commissioner,519 F. 2d 1121, 1126 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976), affg. 61 T.C. 249 (1973); Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), cert. denied 397 U.S. 962 (1970); Estate of Beck v. Commissioner,56 T.C. 297, 365 (1971). Finally, petitioner failed to maintain adequate books and records, and this conduct is additional evidence of fraud. Lollis v. Commissioner,supra, 595 F. 2d at 1192; Estate of Mazzoni v. Commissioner,451 F. 2d 197, 202 (3d Cir. 1971); Cefalu v. Commissioner,276 F. 2d 122, 129 (5th Cir. 1960); Marcus v. Commissioner,70 T.C. 562, 578 (1978), on appeal (5th Cir., Feb. 22, 1979). Both the "Dome" record book and Cumar's bank records fail to accurately reflect gross sales and distributions to or for the benefit of petitioner. Petitioner was obliged by law to keep books and records which reflected his income, see sec. 6001 of the 1954 Code, sec. 1.6001-1(a), Income Tax Regs. *339 , and his failure to fulfill this duty is at least some evidence of fraud. See Estate of Upshaw v. Commissioner,supra,416 F. 2d at 741; Otsuki v. Commissioner,supra,53 T.C. at 109-110. We find that the Commissioner has proved fraud on the part of Marcel Bourque in accordance with the applicable standards for each of the three taxable years. Section 6653(b) of the 1954 Code requires that we find the existence of fraud on the part of Beverly Bourque in order to hold her liable for the additions to tax for fraud. See Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F. 2d 87 (1st Cir. 1972). Mrs. Bourque was an officer of Cumar, but she played no role in the affairs of the corporation.There is also no evidence to indicate that she was an active participant in petitioner's fraudulent course of conduct, although she may well have been aware of such conduct and benefited therefrom. We therefore find that the Commissioner has failed to prove fraud by clear and convincing evidence as to Beverly Bourque. Petitioners argue two issues on brief -- statute of limitations and innocent spouse -- *340 which were not raised in their pleadings and are therefore not properly before us. See Markwardt v. Commissioner,64 T.C. 989, 997 (1975); Rule 39, Tax Court Rules of Practice and Procedure. In any event, there is no merit to their position as to either of these issues. Our finding of fraud lifts the bar of the statute of limitations. Sec. 6501(c)(1) of the 1954 Code. And as to the claim of the benefit of the innocent spouse provisions on behalf of Mrs. Bourque pursuant to sec. 6013(e), there has been a critical failure of proof at least as to whether she knew of the omitted income or significantly benefited from such income. She did not appear as a witness and we have no evidence as to her knowledge as of the time she signed the returns. Moreover, bearing in mind that petitioners invested in excess of $50,000 in two ventures during 1969 and 1970, we could hardly conclude on the record before us that she did not derive significant benefits from the unreported income. The petition in Docket No. 1555-78 will be dismissed for lack of jurisdiction.
Decisions will be entered under Rule 155 in Docket Nos. 4507-76, 7125-77, and 1554-78.
Footnotes
1. The description of petitioner's methods of business operation applies also to Cumar's methods of operation, since petitioner was Cumar's sole employee.↩
2. A deposit slip, dated December 3, 1970, showing the deposit of a check of $2,400, breaks down the source of such deposit as "scrap" - $1,700 and "loan" - $700. However, the only check received by Cumar for such an amount, $2,400, dated and stamped "certified" on December 4, 1970, is stipulated to have been part of Cumar's gross receipts from its scrap metals business. ↩
3. This amount is in excess of the gross receipts shown on Cumar's 1970 return, which were reported at $6,137.44. The discrepancy is unexplained.↩
4. This figure is a composite of the items listed in paragraph 34 of the stipulation of the parties with the addition of a $59.02 item listed in paragraph 33 as a 1968 expense. The $59.02 check was dated January 2, 1968, and was payable to Tarpy's, Inc., a purveyor of meat products. Since Cumar was not in existence on January 2, 1968, it seems clear that the check incorrectly bore the 1968 date rather than 1969, reflecting a common practice of carelessly writing the preceding year in dating a check issued in early January of the new year. We have accordingly adjusted the total for 1969 to include this check, and made a corresponding adjustment in the total for 1968. ↩
5. Two check stubs, which are not referred to in the stipulation, also indicate that additional checks amounting to $76.71 were issued in 1969 to Tarpy's, Inc., probably in payment for meat products, although such check stubs bear the notation "scrap". ↩
6. See note 4, supra↩.
7. Petitioner was also indicted for the same offense with respect to Cumar's 1968 taxable year. The jury similarly found petitioner guilty on this count. However, since Cumar had been incorporated in August of 1968 and had an option to file its first return on a fiscal year basis, the Court of Appeals "reluctantly" (541 F. 2d at 295) reversed the conviction as to 1968 which had been based on the failure to file a return for the calendar year 1968 on March 15, 1969. The indictment also charged petitioner with violating section 7206(1), I.R.C. 1954↩, with respect to Cumar's 1970 return, but the jury found petitioner not guilty on that count.
8. The 1970 return describes the commissions item as including commissions as a "scrap metal salesman and realtor salesman".↩
9. Although petitioner appears to have received some income in 1970 from the sale of real estate, the Commissioner's determination makes no reference to this income. We accordingly make no finding as to such income. ↩
10. None of petitioner's evidence was specifically directed to his cost of sales as a sole proprietor in 1968, and this issue was not addressed by petitioner's counsel on brief. We thus find petitioner's cost of sales as a sole proprietor no longer to be in issue, at least to the extent such costs are involved in the computation of the basic deficiency in tax, exclusive of the addition to tax for fraud. See Rule 149(b), Tax Court Rules of Practice and Procedure.↩
11. Although the parties have failed to inform us as to the full circumstances under which Cumar's charter was "forfeited", it appears that this forfeiture was the result of Cumar's failure to pay Rhode Island franchise taxes. The copy of Cumar's charter in the record is stamped "forfeited under G.L. Ch. 44-12, December 31, 1972." The statutory reference on the stamp is to the provisions of the Rhode Island statutes which require the payment of franchise taxes by all corporations incorporated in the state. See R.I. Gen. Laws sec. 44-12-1 (Supp. 1979). Corporations failing to pay franchise taxes for two years after they become due are placed on a list by the tax administrator; the corporations on this list forfeit their charters upon receipt of the list by the Secretary of State.See R.I. Gen. Laws sec. 44-12-8↩ (1970). In the absence of contrary indications from the parties, we assume that Cumar's charter was forfeited pursuant to these statutory provisions.
12. Corporations whose charter is forfeited for failure to pay franchise taxes may have the forfeiture vacated by paying the taxes and interest within 60 days of publication of notice of the forfeiture. R.I. Gen. Laws sec. 44-12-9↩ (1970). There is no evidence to indicate that Cumar availed itself of this opportunity. 13. R.I. Gen. Laws sec. 7-1.1-98.1 (Supp. 1979) provides as follows: 7-1.1-98.1.Continuation of certain corporate powers. -- Any corporation dissolved in any manner whatever under this chapter or any corporation whose existence is terminated under § 44-12-8↩ shall nevertheless continue for two (2) years after the date of such dissolution or termination for the purpose of enabling it to settle and close its affairs, to dispose of and convey its property, to discharge its liabilities and to distribute its assets, but not for the purpose of continuing the business for which it was organized. The shareholders, directors and officers shall have power to take such corporate or other action as shall be appropriate to carry out the purposes of this section. 14. R.I. Gen. Laws sec. 7-1.1-98 (1969) provides as follows: 7-1.1-98. Survival of remedy after dissolution. -- The dissolution of a corporation either (1) by the issuance of a certificate of dissolution by the secretary of state, or (2) by a decree of court when the court has not liquidated the assets and business of the corporation as provided in this chapter, or (3) by expiration of its period of duration, shall not take away or impair any remedy available to or against such corporation, its directors, officers, or shareholders, for any right or claim existing, or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within two (2) years after the date of such dissolution. Any such action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name. The shareholders, directors and officers shall have power to take such corporate or other action as shall be appropriate to protect such remedy, right or claim. If such corporation was dissolved by the expiration of its period of duration, such corporation may amend its articles of incorporation at any time during such period of two (2) years so as to extend its period of duration.↩
15. See generally 16A R. Eickhoff, Fletcher Cyclopedia of the Law of Private Corporations sec. 8173 (1979 Revd. Volume). ↩
16. The notice of deficiency was issued after the expiration of two years from the date of the corporation's dissolution. If the issuance of the notice is deemed under state law to mark the commencement of a "proceeding", cf. Bahen & Wright, Inc. v. Commissioner, 176 F. 2d 538, 539-540 (4th Cir. 1949), then it is clear that no proceeding was commenced until after the termination of the corporation's existence. It is possible that steps taken in advance of the issuance of the notice of deficiency might be construed under Rhode Island law to be the commencement of a "proceeding". See AmericanStandard Watch Co. v. Commissioner, 229 F. 2d 672, 674-675 (2d Cir. 1956); cf. Badger Materials, Inc. v. Commissioner, 40 T.C. 725, 731-733 (1963), modified 40 T.C. 1061, 1062; Field v. Commissioner, 32 T.C. 187, 205-207 (1959), affd. 286 F. 2d 960 (6th Cir. 1960), cert. denied 366 U.S. 949 (1961). See also Brannon's of Shawnee, Inc. v. Commissioner, 71 T.C. 108, 114-115↩ (1978). However, we need not address this question, since the parties have not pointed to any activities which might conceivably be regarded as the commencement of a proceeding prior to the end of the twoyear period provided in the statute. 17. Petitioners' counsel has also argued that Rhode Island law prevents the Commissioner from asserting any liability on the part of petitioner as a transferee of Cumar. See sec. 6901, I.R.C. 1954↩. However, none of the notices of deficiency giving rise to the petitions in this case assert any transferee liability. Accordingly, we do not consider the point.
18. Of course, if Cumar were on the accrual basis of accounting, the Commissioner would have had to subtract also any income taxes that were accruable in respect of such taxable income. However, there was no showing that Cumar was on the accrual basis, and the fact that it maintained no inventory, selling its scrap immediately upon acquisition, was consistent with treating it as a cash basis taxpayer.↩
19. They do not specify whether they mean 10 percent of cost or 10 percent of sales price. ↩
20. As to one of those expenditures, an item of $20,000, we found unconvincing petitioner's vague testimony that it had its source in a non-interest-bearing cash loan from his mother.↩
21. Such understatements had their source in the profits of scrap enterprise, and, as noted above, p. 23, there is no contention by petitioners that Cumar's earnings, to the extent relevant, remained undistributed with the corporation.↩
22. We are fully aware of the fact that we cannot find that petitioner understated his taxable income and make a finding of fraud solely on the basis that petitioner has failed to carry his burden of proof with respect to the basic deficiencies. See Webb v. Commissioner,394 F. 2d 366, 379 (5th Cir. 1968); George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Estate of Beck v. Commissioner,56 T.C. 297, 363↩ (1971). We have made an affirmative finding based on the evidence as a whole that petitioner received unreported income from Cumar.Furthermore, our findings of fraud are not based solely on petitioner's understatements of income, since there are other significant indicia of fraud, as more fully set forth hereinafter.