DUANE O. HESTNES and JEAN HESTNES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hestnes v. Commissioner
Docket Nos. 7933-77, 8215-78.
United States Tax Court
T.C. Memo 1983-727; 1983 Tax Ct. Memo LEXIS 60; 47 T.C.M. (CCH) 528; T.C.M. (RIA) 83727; December 7, 1983. Robert D. Heidel and Frederic J. Brouner, for the petitioners. Joseph R. Peters, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In statutory notices of deficiency dated April 14, 1977, in docket No. 7933-77 and April 13, 1978, in docket No. 8215-78, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(b)[1] as follows: Additions to Tax
Docket No.
Year
Deficiency
Sec. 6653(b)
8215-78
1970
$5,670.19
$3,432.83
1971
17,750.31
10,910.38
1972
26,639.39
13,319.70
7933-77
1973
19,436.34
*62 By order of this Court these cases were consolidated for purposes of trial, briefing, and opinion. After concessions, the issues for determination are: (1) Whether the statute of limitations bars the assessment and collection of the deficiencies, if any, in income tax due from petitioners for each of the taxable years 1970 through 1972; (2) Whether petitioner Duane O. Hestnes understated the net income from his meat processing business and thereby understated petitioners' taxable income for each of the years 1970 through 1972; (3) Whether any part of the underpayment of tax, if any, for each of the taxable years 1970 through 1972 was due to fraud on the part of petitioner Duane O. Hestnes within the meaning of sections 6501(c) and 6653(b); (4) Whether certain expenditures to sponsor a race car are deductible under section 162 for the taxable year 1972; (5) Whether certain expenditures to remodel a slaughterhouse are deductible for the taxable year 1972; and (6) Whether petitioner Duane O. Hestnes received constructive dividends from S & S Meats, Inc., in 1972 and 1973. Respondent has conceded that Jean Hestnes is not liable for the additions to tax under section 6653(b). *63 Because the issues herein are largely factual in nature, we have combined the Findings of Fact and Opinion. Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Background of the Business
Duane O. Hestnes (petitioner) and Jean Hestnes, husband and wife, resided in Stoughton, Wisconsin, at the time their petitions herein were filed. Petitioners timely filed joint Federal income tax returns for 1970 through 1973 with the Internal Revenue Service Center, Kansas City, Missouri. In 1965 petitioner opened a slaughterhouse under the name S & S Meats (hereinafter S & S) and operated it as a sole proprietorship. Mrs. Hestnes did not participate in this business. Originally, S & S purchased and slaughtered cattle and sole the meat at retail. Some revenue was also derived from custom slaughtering cattle owned by farmers and returning the meat to the farmers. S & S elected an accrual basis of accounting. By 1969, S & S had evolved into an operation specializing in the slaughtering of "distressed" cattle and selling the boned meat at wholesale. Distressed animals are animals *64 that are not healthy. They may, for example, suffer from broken legs, calving paralysis, or foot rot. The retail operations of the business, including the retail portion of the custom slaughtering of animals owned by farmers, was leased by petitioner to Dick Dobrzynski. All of the animals processed by S & S were inspected by an employee of the Wisconsin Department of Agriculture. During the years at issue herein, S & S purchased animals from three basic sources. The primary source was independent suppliers. These suppliers would visit the farmers in the vicinity of the slaughterhouse, purchase distressed animals, and sell those animals to S & S. These purchases were termed "subject." If a "subject" animal did not pass inspection, S & S did not have to pay the supplier for it. If the animal passed inspection, the supplier was issued a check based on a negotiated price per pound for the hanging weight of the carcass. The second source of animals was cattle purchased by petitioner at sales barns. These animals generally were not distressed and were more expensive than those purchased from independent suppliers. Purchases at the sales barns were final (i.e., the risk of the *65 animal's passing inspection was on the purchaser), and petitioner issued checks for these purchases. The final and smallest source of animals was purchases directly from farmers. Farmers would sometimes bring a distressed animal directly to the slaughterhouse rather than sell it to an independent supplier on the theory that they could negotiate a better deal with petitioner. The number of such purchases varied; 10-15 distressed animals might be purchased in 1 week, and other times none would be purchased for 2-3 weeks. Some of these purchases were by check and some were for cash. The negotiated price depended, in part, on who bore the risk of the animal's passing inspection and on the form of payment. Some farmers would accept a lower price if payment was by cash. The cash cost of a cow varied. An animal that would cost $200 if the seller bore the risk of passing inspection and payment was by check could be purchased for $50 to $100 in cash. Although S & S derived the majority of its revenue from the sale of boned meat, revenue was also derived from the sale of animal by-products. After a slaughtered animal passed inspection, it was eviscerated, the skin was removed, and *66 the carcass was boned. The offal (i.e., the viscera and trimmings from the deboning process) and the animals condemned upon inspection were useful by-products to fat renderers and pet food processors. These by-products were stored in large drums and sold to the purchasers offering the highest price per pound. The total purchase price was not determined, however, until the purchasers weighed the by-products at their own facilities. A final, much smaller source of revenue was fees derived from custom slaughtering animals owned by farmers. On September 1, 1972, petitioner incorporated S & S (hereinafter the corporation is referred to as S & S, Inc.) and became its president and sole shareholder. Petitioner retained ownership of the slaughterhouse facilities and leased them to S & S, Inc. Petitioner also retained the accounts receivable, which totaled $43,348 immediately prior to incorporation. After incorporation, the slaugtering operation continued much as it had before except that, for an unknown period of time, petitioner discontinued the practice of occasionally purchasing animals for cash. Recordkeeping
Petitioner's recordkeeping for S & S was at best minimal. No *67 records were maintained of the number of animals purchased with cash or the amount paid for those animals. Animals brought to S & S for slaughter were accounted for in a "kill book." Daily entries in that book included the number and type of animal brought in no that date, an indication of whether the purchase was subject to inspection, and the name of the supplier. Sometimes, however, an entry was merely labeled "custom" without identification of the supplier. Although the generally accepted definition within the animal slaughtering industry of the term "custom" refers to the service of slaughtering animals owned by farmers, petitioner also used this term to refer to animals purchased directly from farmers. Entries labeled "custom" in the kill book could refer to either of these two meanings. After the carcass of an animal passed inspection, it was weighed, and that weight and the name of the supplier were entered into a "weight book" on the date corresponding to the date that the animal was slaughtered. An exception to this procedure was that the weight of an animal listed as "custom" in the kill book was generally not entered in the weight book. The number of entries for *68 other than custom animals in the kill book did not, however, always correspond with the number of entries in the weight book. For example, the number of entries in each of those books for the period July through December of 1971 is summarized below: Total No. of Entries
Month
Kill Book *
Weight Book
Difference
7/71
315
303
12 8/71
294
300
(6)
9/71
245
245
0 10/71
288
286
2 11/71
250
228
22 12/71
304
223
81 Total
1,696
1,585
111 Petitioner essentially used the weight book as an accounts payable ledger. Each week he would add the total weight from each supplier and issue a check based on that weight. The weight book did not note the price per pound or the total amount to be paid to a supplier. Petitioner kept track of sales and accounts receivable for boned meat through the use of sales invoices. These invoices were not sequentially numbered, however, and it is not possible to determine from them the total sales of boned meat for any year at issue. The only invoices produced at trial were for a 6-month period in 1971, and petitioner claimed he could not find any for the other *69 6 months of that year or for 1970 or 1972. Petitioner did not establish or maintain an accounts receivable ledger for the sales of the by-products. Petitioner regularly deposited the checks from the sales of boned meat on behalf of S & S, but sometimes he withdrew cash proceeds from those checks at the time of the deposit. The checks from the sales of the by-products were not deposited. Petitioner cashed these checks and usually did so on days other than the days when he made the regular deposits. He cashed 60, 99, and 54 of such checks in 1970, 1971, and 1972, respectively. The cash received by petitioner from the above transactions may be summarized as follows: Year Cash Received
Source of Check
1970
1971
1972
Sales of Boned Meat
$ 6,191.75
$2,098.75
Sales of By-Products
14,223.94
41,153.45
21,483.96
Total [2]
$20,415.69
$43,252.20
$21,483.96
Tax Return Preparation and Investigation
Petitioners' tax returns for 1970 through 1973 were prepared by Gordon Schroeder, *70 a certified public accountant. Mr. Schroeder was not informed by petitioner that any cash purchases of animals had been made during those years. On September 21, 1973, petitioner was stopped by the Madison, Wisconsin Police. The police searched petitioner's automobile and found a small quantity of marijuana and approximately $21,000 in currency. Shortly thereafter, the Internal Revenue Service was notified of these facts and Charles H. Reppert, who at that time was a revenue agent, was assigned to examine petitioner's 1972 tax return. Mr. Reppert first met with petitioner in October or November of 1973, and they had several meetings during the course of Mr. Reppert's examination. Petitioner told Mr. Reppert that all of S & S's gross receipts were deposited in a bank account and that the amount of sales reported on his tax returns was based on the amount of deposits in that account, with some adjustment for year-end accruals. Although petitioner met with Mr. Reppert on several occasions prior to December of 1975, it was not until December, when petitioner was accompanied by counsel, that he first claimed that he purchased some animals in 1970 through 1972 for cash. Limitations
*71 Section 6501(a) generally provides that an income tax must be assessed within 3 years after the filing of a return or the due date for the return, whichever is later. In the instant case, the statutory notice of deficiency in docket No. 8215-78 was issued April 13, 1978, more than 3 years after petitioners filed their 1970, 1971, and 1972 returns. Accordingly, respondent has the burden of proving an exception to the general period of limitations. Farmers Feed Co. v. Commissioner,10 B.T.A. 1069 (1928). Respondent raises the exception to the general period of limitations set forth in section 6501(c)(1), i.e., in the case of a fraudulent return. [3] Respondent's burden under this exception is the same as that which respondent bears in sustaining an addition to tax for fraud under section 6653(b). Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3rd Cir. 1967); Botwinik Brothers of Mass., Inc. v. Commissioner,39 T.C. 988, 996 (1963). To satisfy his burden in this case, respondent must show by clear and convincing evidence *72 that (1) there is some underpayment in petitioners' tax for each of the years 1970 through 1972 and (2) that a part of that deficiency is due to fraud. Section 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651 (3d Cir. 1974); Miller v. Commissioner51 T.C. 915, 918 (1969). It is only after this burden has been met that respondent may rely on the presumptive correctness of his notice of deficiency for determinations with respect to which evidence is lacking. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). [4]
For reasons *73 subsequently set forth, we conclude that respondent has carried his burden of proving that petitioners' 1970, 1971, and 1972 returns were fraudulent within the meaning of sections 6501(c)(1) and 6653(b). The statutory notice was therefore timely issued for each of those years. Understatement of Taxable Income
Respondent contends that in each of the years 1970, 1971, and 1972, petitioner understated the gross receipts of S & S Meats and thereby understated his taxable income. Petitioner does not deny that he reported the gross receipts of S & S based on total deposits, and he concedes that he cashed the subject checks. He asserts, however, a three-pronged argument as to why his taxable income was not understated. Petitioner first argues that respondent has not met his burden of showing by clear and convincing evidence that the cash received from the checks was not subsequently deposited and thus included in gross receipts. He has not suggested any reason why he (or anyone) would regularly cash checks and then turn around and deposit the cash. Petitioner does not claim that he pursued such an illogical course of action. To the contrary, he affirmatively asserts (see *74 infra) that he used the proceeds received by him to purchase animals for S & S. In any event, Mr. Reppert testified that he examined some of petitioner's deposit slips for each of the years in issue and found no record of cash deposited and that he interviewed the bank's bookkeeper, who informed him that petitioner had made no cash deposits during the period she worked for the bank and prior to 1974. No objection was made to this testimony.We are convinced that petitioner did not deposit the cash received from the checks. Petitioner stated to Mr. Reppert that the gross receipts reported on his tax return were based on actual deposits. He has not subsequently denied that he made that statement nor that it was correct. His deposits included neither cash drawn from checks cleared through the bank as deposits nor checks for the sale of by-products, which he cashed in a manner that prevented tracing from deposit slips. This evidence is clear and convincing that gross receipts were substantially understated. Petitioner next argues that, even if his gross receipts were understated, respondent has not shown the tax years to which such understatements applied. S & S maintained *75 its books on an accrual basis and, according to petitioner, it is possible that the checks cashed represented sales made in prior years. The facts do not support his argument. Most of the checks cashed by petitioner were from the sale of by-products. The fact that petitioner did not establish an accounts receivable ledger for these sales suggests that the typical length of time between such sale and the date a purchaser issued a check in payment was minimal. Petitioner cashed 60, 99, and 54 checks from the sale of by-products in 1970, 1971, and 1972, respectively. Petitioner's claim that all of those checks may represent sales from a year other than the year in which they were cashed is unworthy of belief. Checks cashed in 1971 or 1972 would at most be attributable to sales in the prior year, which is also before the Court. "In sustaining his burden of proof, respondent is not required to prove the precise amount of the underpayment resulting from fraud, but only that 'any part' of the underpayment is attributable thereto." Otsuki v. Commissioner,53 T.C. 96, 105 (1969). It is unfortunate that neither party provided the Court with the dates of the checks involved. *76 [5] On the basis of the instant record, however, we conclude that at least a major portion of the checks represents sales made in the year that they were cashed. Petitioner finally argues that any understatement of gross receipts of S & S for 1970, 1971, and 1972 did not cause an understatement of petitioners' taxable income because deductions for cash purchases of animals were not claimed for those years, and such additional deductions more than offset any increase in gross receipts. Because respondent presented clear and convincing evidence of unreported gross receipts, petitioner had the burden of proving his contention that his unclaimed deductible expenses offset those receipts. United States v. Shavin,320 F.2d 308 (7th Cir. 1963). [6]
*77 Petitioner did not maintain records as to the number of amount of cash purchases and offered only his own estimates and the opinion testimony of Paul Yeager, which, for the reasons stated below, must be discounted. Although we are convinced that petitioner made some cash purchases, we do not believe that such purchases approximated the total amount of unreported receipts. Mr. Yeager, a certified public accountant, examined the sales invoices, check stubs, and kill and weight books of S & S for the 6-month period July through December 1971. He did not examine those materials for the remaining periods in issue because the 1970 weight book and sales invoices and check stubs for those periods were not provided to him by petitioner. Mr. Yeager compared the total boned meat sold per the sales invoices with the total weight of the carcasses in the weight book and determined that S & S realized an unreasonably high yield of boned meat. He then assumed that the only explanation for this high yield was that animals must have been purchased for cash and that their carcass weight was not entered in the weight book. Based on this assumption and assuming an average carcass weight of 506 *78 pounds per animal and cost of 20 cents per pound, he estimated that petitioner made the following cash purchases: Number of
Year
Animals
Total Cost
1970
210
$21,262.50
1971
520
52,650.00
1972
371
37,563.75
Mr. Yeager's estimates must be viewed, however, in the light of several inherent weaknesses. First, his estimates were based on the assumption that the only possible explanation of a high yield of boned meat from carcass weight was unrecorded cash purchases of animals. Petitioner testified that he purchased small amounts of finished meats for resale and that he sometimes sold beef by the entire carcass. Mr. Yeager does not appear to have accounted for these facts in his calculations. Second, Mr. Yeager's calculations were made from only 6 months of S & S's records, and they rely heavily on the accuracy of those records. These records, however, were totally inadequate. The sales invoices were not consecutively numbered, and it is impossible to determine accurately total sales therefrom; it is not possible to determine whether an entry labeled "custom" in the kill book referred to an animal owned by a farmer or purchased by S & S; and for the *79 6-month period examined by Mr. Yeager, the kill and weight books reflected a substantially different number of entries. Third, Mr. Yeager's estimates were inconsistent with petitioner's own testimony. When questioned as to the number of animals purchased for cash, petitioner stated: "It would vary. Some weeks it would be 10 to 15 purchased, and maybe for a two or three week period there may be none." Petitioner's testimony, at best, supports only a conclusion that he purchased 270 animals per year (i.e., 15 animals purchased every third week), a number substantially less than the 520 and 371 animals estimated by Mr. Yeager for 1971 and 1972, respectively. In any event, this Court is not bound by the testimony of an expert witness; it must be rejected where the witness overlooked significant factors in reaching his conclusion. See South Texas Rice Warehouse Co. v. Commissioner,366 F.2d 890, 898 (5th Cir. 1966), affg. 43 T.C. 540 (1965). Respondent, on the other hand, argues that petitioner made no cash purchases of animals during the period 1970 through *80 1973. We are convinced for several reasons, however, that petitioner made some cash purchases of animals. It is not unusual for cash purchases to occur as described by petitioner, and his testimony that discounts were available for cash is not incredible. Harold Starks, a former employee of petitioner, testified that he saw petitioner make some cash purchases of animals from farmers. A few of the entries labeled "custom" in the kill book are also labeled "conditional." If all the "custom" animals actually belonged to farmers as respondent claims, there would be no reason to mark a transaction as "conditional." Accordingly, we conclude that petitioner did purchase some animals for cash, but not to the extent of unreported receipts established for each year, i.e., $20,315.69 for 1970, $42,652.20 for 1971, and $21,483.96 for 1972. Having concluded, however, that there were some cash purchases, we must make as close an approximation of the amount as we can, bearing heavily upon the taxpayer whose inexactitude is of his own making. Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930). Based on the entire record before us, we conclude that in each of the years *81 1970 and 1971, S & S purchased 175 animals at a total cost of $10,000 and that during the portion of the year the business was operated as a sole proprietorship in 1972, S & S purchased 115 animals at a total cost of $6,500. Inasmuch as these deductions are substantially less than the unreported receipts, a deficiency exists for each of the years 1970, 1971, and 1972. Additions to Tax
The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). The evidence must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this *82 Court. Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. Having concluded that taxable income was understated, we are compelled by several facts to infer that such understatement was due to fraud. In particular, petitioner stated to former Revenue Agent Reppert that all of the gross receipts of S & S were deposited when, in fact, petitioner personally cashed numerous checks totaling $20,415.69, $43,252.20, and $21,483.96 in 1970, 1971, and 1972, respectively. He also initially failed to disclose his dealings in cash later claimed to be used for purchases. Such conduct is a strong indication of the intent to mislead or conceal that is a predicate to the imposition of the additions to tax for fraud. Petitioner's pattern of (1) cashing checks from the sale of by-products (for which he maintained no accounts receivable), (2) cashing these checks on days other than the days when he made regular *83 deposits, and (3) usually not cashing the checks from regular customers (for which he did maintain accounts receivable), may also be viewed as an attempt to mislead or conceal. A further indication of fraud is petitioner's pattern of consistent failure to disclose income from the sale of by-products and to report the tax due on that income on his 1970 through 1972 returns. See Powell v. Granguist,252 F.2d 56, 60 (9th Cir. 1958). A person with petitioner's general intelligence and business experience must have been aware of the recordkeeping requirements of the revenue laws. See Otsuki v. Commissioner,supra at 112. Petitioner did not, however, maintain adequate books and records. He has failed to explain the disappearance of records. He testified that he attempted to keep his cash separate from that of S & S simply by knowing in his own mind how much belonged to whom, and he asks us to rely on his representations in that regard. Petitioner's statements to Mr. Repport and his testimony at trial contained many inconsistencies and incredible assertions. He failed to deny or explain incriminating evidence under circumstances in which *84 silence may be deemed an admission. See Ishler v. Cook,299 F.2d 507, 510 (7th Cir. 1962). In 1975 or 1976, he was convicted of an unrelated felony. See Fed. Rules of Evidence, Rule 609. We therefore disregard his testimony to the extent that it is controverted by stronger evidence. Upon the basis of the foregoing and consideration of the record as a whole, we hold that respondent has proved by clear and convincing evidence that a part of the deficiency in each of the taxable years 1970 through 1972 was due to fraud on the part of petitioner.
Advertising
Sometime in 1972 petitioner paid $1,000 to Gene Wegner to sponsor a race car. Petitioner deducted this expenditure as "advertising" on Schedule C, Form 1040 for 1972. Section 162 generally provides that a deduction shall be allowed for ordinary and necessary expenses incurred in carrying on a trade or business. "Ordinary" has been interpreted as that which is "normal, usual or customary" in the taxpayer's trade or business. Deputy v. DuPont,308 U.S. 488, 495 (1940). "Necessary" has been *85 construed to mean "appropriate" or "helpful," not "indispensable" or "required." Ford v. Commissioner,56 T.C. 1300, 1306 (1971), affd. 487 F.2d 1025 (9th Cir. 1973). An activity for which advertising expenses are claimed must be reasonably calculated to advertise the business of the taxpayer. [7]
Respondent's only contention seems to be that petitioner has not shown a proximate relationship between the race car sponsorship and the business of S & S. Respondent does not contend that the expenditure was not made or was unreasonable in amount. The race car was raced at several local circuits. The sponsorship of the car entitled petitioner to have the name "S & S Meats" displayed on the vehicle and track announcers periodically referred to the car by the name of the sponsor. These races were frequently attended by local farmers, and S & S Meats sometimes purchased distressed animals directly from these farmers. Under these circumstances, we conclude that petitioner has shown that the sponsorship expenditure was reasonably calculated to advertise the business *86 of S & S. Such expenditure is therefore deductible under section 162. Remodeling Expenditures
In April of 1972, petitioner terminated his business relationship with Mr. Dobrzynski, who had previously handled the retail operations. Shortly thereafter, petitioner engaged Hercules Construction (Hercules) to perform various work at the slaughterhouse. The retail portion of the plant, including a smoke house, dairy cooler, and retail cases, was removed and the facilities were remodeled into a more complete boning operation. Payments were made to Hercules in 1972 by both petitioner and S & S Meats, Inc. Petitioner deducted his payments to Hercules as repairs on Schedule C, Form 1040 for 1972. In his notice of deficiency, respondent determined that payments made by petitioner to Hercules in 1972 totaling $4,617.89 for work performed at the slaughterhouse were capital expenditures and thus not currently deductible. Respondent also determined that a payment of $500 by petitioner to his father was not deductible. Petitioner, on the other hand, contends that the amounts paid to Hercules were for work in the nature of repairs and are therefore currently deductible. Respondent now *87 concedes that if the expenditures were capital in nature, petitioner is entitled to a depreciation deduction for 1972 under section 167. In Plainfield-Union Water Co. v. Commissioner,39 T.C. 333, 338 (1962), this Court stated that the proper test for distinguishing between a repair and a capital expenditure is "whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." See also Illinois Merchants Trust Co. v. Commissioner,4 B.T.A. 103, 106 (1926). In this case, petitioner's own description of the work performed on the slaughterhouse shows that it was to remove the retail facilities and replace them with facilities used in the boning process, rather than to merely repair or mend existing facilities. Accordingly, we hold that these expenditures must be capitalized. Petitioner offered no evidence regarding the payment of $500 to his father. Respondent's determination as to the nondeductibility of this payment is therefore *88 sustained. Welch v. Helvering,supra; Rule 142(a). Constructive Dividends
A.Cash Held by Petitioner
S & S, Inc., was incorporated September 1, 1972, and adopted a January 31 fiscal year-end. The corporate tax returns for the taxable years ending January 31, 1973, and January 31, 1974, were prepared by Mr. Schroeder. At the end of each of those periods an adjusting journal entry was made by Mr. Schroeder to S & S, Inc.'s books to reflect cash on hand but not deposited in a corporate account, as follows: Journal Entry
Tax Year Ending
Account
Debit
Credit
January 31, 1973
Cash
$18,604.06
Sales
$18,604.06
January 31, 1974
Cash
$19,595.94
Sales
$19,595.94
Total
$38,200.00
$38,200.00
On April 15, 1974, petitioner deposited $30,000 in currency in the account of S & S, Inc. Prior to that date, no notes or other evidence of an obligation existed indicating a loan by S & S, Inc., to petitioner. Respondent argues that petitioner had uncontrolled personal use of corporate funds and that such use constitutes a constructive dividend under sections 301 and 316. Petitioner contends that the *89 adjusting journal entries were a mistake caused by miscommunication between him and S & S, Inc's accountant. He argues for the first time on brief that "the accounting entries are obviously in error because there were no cash sales by the corporation and the Petitioner was not cashing any corporate checks." Petitioner asserts that all of the cash in his possession was his own from salary, rental income, and the collection of accounts receivable retained by him at the time S & S was incorported. This argument is unpersuasive. Petitioner did not offer the testimony of the accountant, and his argument is contradicted by statements in his own petition in docket No. 7933-77. Paragraph 5 of that petition states: (5) The facts upon which Petitioners rely, as a basis of their case, are as follows: * * * (k) As President and Chief Operating Officer of S & S Meats, Inc., Petitioner Duane Hestnes often had in his possession cash sales receipts of said corporation. (l) Cash sales receipts in the possession of Duane Hestnes were accounted for on the books of S & S Meats, Inc. and taxes paid thereon. (m) Said cash sales receipts were in fact deposited to the credit of S & S Meats, *90 Inc. by Petitioner Duane Hestnes. Again petitioner is confronted by his own inconsistent statements. We conclude that petitioner has failed to prove error in respondent's determination that he received constructive dividends of $14,883.25 and $21,683.76 in 1972 and 1973, respectively.[8]
B. Payment by S & S, Inc., to Hercules
In 1972 S & S, Inc., paid $2,434.36 to Hercules. Respondent determined that this payment was in satisfaction of a personal obligation of petitioner and as such constitutes a constructive dividend under sections 301 and 316. Petitioner argues that under the terms of the lease between S & S, Inc., and himself, the corporation was required to pay all building expenses. This argument does not, however, address the heart of the issue, i.e., who was obligated to Hercules *91 and for what? If the obligation to Hercules was a personal obligation of petitioner, then the satisfaction thereof by the corporation is dividend income to petitioner. Sections 301 and 316. If, on the other hand, the obligation was that of the corporation, then the satisfaction thereof is not income to petitioner. Petitioners bear the burden of persuasion and the ultimate burden of going forward with the evidence on this issue. Welch v. Helvering,supra; Rule 142(a).
Shortly after terminating his business relationship with Mr. Dobrzynski in April of 1972, petitioner contracted with Hercules to perform some construction work at the slaughterhouse. S & S, Inc., was not incorporated until September 1, 1972. Petitioners have not established whether the payment by S & S, Inc., to Hercules was in satisfaction of the pre-existing contract obligation of petitioner or was in satisfaction of an obligation of S & S, Inc. Accordingly, respondent's determination as to this issue must be sustained. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
*. Entries other than "custom."↩
2. Respondent determined that, of the total cash received, petitioner failed to report $20,315.69, $42,652.20, and $21,483.96 in 1970, 1971, and 1972, respectively.↩
3. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
4. See Breen v. Commissioner,T.C. Memo 1983-645; Compton v. Commissioner,T.C. Memo 1983-642; and Hansen v. Commissioner,T.C. Memo. 1981-98↩.
5. The gaps in the evidence appear unjustified and place an unnecessary burden on the Court. We are satisfied, however, that the totality of the evidence clearly and convincingly establishes each element necessary to respondent's case and the results reached herein.↩
6. "It is uniformly the rule, even in criminal tax evasion cases where the Government bears the greater burden of proof beyond a reasonable doubt, 'that evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any.' Siravo v. United States,377 F.2d 469, 473 (1st Cir. 1967)." Bourque v. Commissioner,T.C. Memo. 1980-286, 40 T.C.M. 824↩, 833.
7. See Lang Chevrolet Co. v. Commissioner,T.C. Memo. 1967-212↩.
8. Respondent determined the amount of constructive dividends as follows: ↩
1972
1973
$18,604.06 [cash] / 5 months [short
tax year] X 4 months in 1972 =
$14,883.25
$18,604.06 [cash] / 5 months [short
tax year] X 1 month in 1973 =
$ 3,720.81
$19,595.94 [cash] / 12 months X 11
months in 1973=
17,962.95
Total
$14,883.25
$21,683.76