76 F.3d 378
 77 A.F.T.R.2d 96-997, 96-1 USTC P 50,138
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Larry O. GILL and Quilting Creations By D.J., Inc.,
Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 94-2335.
 United States Court of Appeals, Sixth Circuit.
 Jan. 23, 1996.
 
 Before: KENNEDY, GUY, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 The Commissioner of Internal Revenue assessed an income tax deficiency against an individual taxpayer, Larry O. Gill, and a corporate taxpayer, Quilting Creations by D.J., Inc. After considering the taxpayers' petition to disallow the assessments, the United States Tax Court reversed the Commissioner's determination in part and affirmed in part. Gill and Quilting now appeal the judgment entered against them by the tax court, contending that the tax court clearly erred in several of its factual findings, and erred in concluding that the Commissioner did not abuse her discretion in refusing to grant a waiver of the penalty for substantial underpayment of tax. Concluding that the petitioners' arguments lack merit, we affirm.
 
 I.
 
 2
 Larry Gill married Debra Bell in 1978. The next year, Bell started Quilting as a sole proprietorship; its business was the design and manufacture of stencils for quilts, arts and crafts, and clothing. Initially, Quilting employed Gill part-time, but Gill became fully involved in the business by 1982. Quilting incorporated in 1984, and Gill owned 49 shares of the closely held stock, while Bell owned 51 shares.
 
 
 3
 Bell and Gill separated in 1985. As part of their separation agreement, Gill became the sole shareholder of Quilting. Quilting's business became quite successful; in 1986, the gross receipts were approximately $1 million, and only two years later, they had increased to $1.5 million.
 
 
 4
 In 1978, Gill began driving race cars, and in 1985, decided that race car sponsorship would be a good form of advertising for Quilting. He thought such a program "would create a unique image for Quilting because no other company in its industry sponsored race cars." To implement this scheme, Gill first purchased a blue Camaro in his own name. He raced the car six or seven times, and then crashed it and sold it in 1986. Also in 1986, Gill bought a red Camaro, raced it about eight times, and sold it several months later. At the time he sold the red Camaro, Gill bought a Trans Am, which he raced at least through 1988.
 
 
 5
 Quilting sponsored Gill's race cars through this period. Gill raced at tracks in various cities in Ohio during the May-to-September racing season. Each of Gill's cars prominently displayed Quilting's name. Gill's racing attracted a fair amount of attention, including an interview by ESPN, which was never broadcast; a favorable article in a trade magazine; and correspondence from a number of customers.
 
 
 6
 In 1987, an established race car driver, Gene Pringle, approached Gill and asked if Quilting would sponsor his racing. Pringle and Gill were unacquainted prior to this overture by Pringle. Quilting agreed to sponsor Pringle, and in 1988, Pringle drove in at least two races in which the Quilting name was prominently displayed on his car, and which races were broadcast nationally.
 
 
 7
 In the tax year ending in 1987, Quilting claimed deductions of $30,910 for race car sponsorship as part of its advertising budget, and in 1988 claimed deductions of $44,252. Of the 1987 amount, $26,310 was attributable to expenses for maintaining Gill's various cars; of the 1988 amount, $3,077 was spent sponsoring Pringle's race car, and the remainder, $41,175, was attributable to Gill's Trans Am.
 
 
 8
 The IRS commenced an investigation of Quilting's and Gill's tax liabilities for the years 1986, 1987, and 1988, determined deficiency amounts were owed with regard to a number of items, and assessed a number of penalties. Quilting and Gill petitioned the tax court, contending that the Commissioner made a number of erroneous determinations in the notice of deficiency. The tax court agreed with Quilting and Gill with regard to some issues, none of which are implicated by this appeal, but nonetheless affirmed the Commissioner's determination in other areas. The petitioners then filed this timely appeal.
 
 II.
 
 9
 The United States Courts of Appeals have exclusive jurisdiction to review decisions of the tax court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury" IRC § 7482(a). Thus, a tax court's findings of fact can be disturbed only if they are clearly erroneous, and questions of law are subject to de novo review. Conti v. Commissioner, 39 F.3d 658, 662 (6th Cir.1994), cert. denied, 115 S.Ct. 1793 (1995).
 
 III.
 A.
 
 10
 The tax court concluded that Quilting's race car sponsorship was an ordinary and necessary expense because it "was reasonably calculated to advertise" Quilting's business, and was not merely "a 'thin cloak for the pursuit of a hobby' by Gill," which had been alleged by the Commissioner. After concluding that "Quilting's race car sponsorship was undertaken primarily for Quilting's benefit and was proximately connected to its business," that is, an ordinary and necessary business expense, the tax court turned to the question of whether "the deductions [Quilting] claimed are reasonable in amount," and concluded that they were not, because the amount spent on Gill's race cars, $26,310 in 1987 and $41,175 in 1988, was far in excess of the amount spent in the arm's-length transaction with Pringle, of only $3,077. "If," as the tax court observed, "Quilting considered the advantages afforded by sponsoring Pringle's car to have been worth about $3,000, the record does not explain why Quilting would have needed to incur so much additional expense in order to obtain essentially the same type of benefits from sponsoring Gill's race cars." Accordingly, the tax court limited the amount that Quilting could claim as a deduction for each year to the amount paid to Pringle, and allowed deductions to Quilting of $9,231 for the three cars sponsored in tax year 1987, and $6,154 for the two cars sponsored in tax year 1988
 
 
 11
 Quilting argues that the amount it claimed for racing expenses was reasonable. It argues that the amounts claimed for the years in question were only small percentages, 30.75% and 18.71%, respectively, of the total advertising budget, and even smaller percentages, 2.19% and 2.95%, respectively, of gross sales for those years. It invites our attention to case law in which race car expenditures constituting larger percentages of advertising costs or of gross revenues were approved by courts.
 
 
 12
 Section 162(a) of the Internal Revenue Code creates a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." I.R.C. § 162(a). "[T]he rulings of the Commissioner with respect to whether a particular expenditure is an ordinary and necessary business expense have the support of a presumption of correctness." Kalamazoo Oil Co. v. Commissioner, 693 F.2d 618, 620 (6th Cir.1982). The tax court's determinations in this case that the race car expenses were ordinary and necessary, but unreasonable and excessive, were factual determinations, to be reviewed for clear error only. See id.; Commissioner v. Lincoln Elec. Co., 176 F.2d 815, 817 (6th Cir.1949), cert. denied, 338 U.S. 949 (1950).
 
 
 13
 An expense is ordinary under section 162(a) if it is "normal, usual, or customary" in the context of the particular business out of which it arose. Deputy v. du Pont, 308 U.S. 488, 495-96 (1940); see Lilly v. Commissioner, 343 U.S. 90 (1952). An expense is necessary if it is appropriate and helpful to the taxpayer's business. Commissioner v. Tellier, 383 U.S. 687, 689 (1966). But even where an expense is, generally speaking, ordinary and necessary, it is deductible only to the extent it is reasonable in amount: "[T]he element of reasonableness is inherent in the phrase 'ordinary and necessary.' Clearly it was not the intention of Congress to automatically allow as deductions operating expenses incurred or paid by the taxpayer in an unlimited amount." Lincoln Elec. Co., 176 F.2d at 817. Thus, the issue is not, as the petitioners would have it, the percentage of the advertising budget, or of gross receipts that was spent on Gill's race car; the issue is whether in spending the amount claimed, the petitioners paid a fair and reasonable rate. Thus, if Quilting had simply made a flat outlay of $10,000 to Gill for no purpose whatsoever, it could not reasonably argue that the amount was deductible because it was only a small percentage of Quilting's budget. While the petitioners cite to cases in which taxpayers spent a higher percentage of their budget on race cars, see, e.g., Hestnes v. Commissioner, 47 T.C.M. 528 (1983); Lang Chevrolet Co. v. Commissioner, 26 T.C.M. 1054 (1967), it may be that those taxpayers had smaller budgets, or that they sponsored more race cars--indeed, there are a number of possible justifications, none of which have been shown by Quilting to exist with respect to its business. See Deputy, 308 U.S. at 495.
 
 
 14
 Thus, the only salient issue here is whether it was reasonable for Quilting to spend $26,310 in 1987 and $41,175 in 1988 to sponsor Gill's race car driving. "Transactions between related taxpayers or between a close corporation and its principals ... must be subject to close scrutiny" Tulia Feedlot, Inc. v. United States, 513 F.2d 800, 805 (5th Cir.) (citing United States v. Ragen, 314 US 513 (1942)), cert. denied, 423 U.S. 947 (1975). "Where there is an absence of arm's length dealing, the Commissioner may inquire into what constitutes [a] reasonable [amount] to determine whether the amount paid exceeds what would have been paid had the parties dealt at arm's length." Southeastern Canteen Co. v. Commissioner, 410 F2d 615 619 (6th Cir.), cert. denied, 396 U.S. 833 (1969); see Jaques v. Commissioner 935 F2d 104, 106 (6th Cir.1991). Quilting presented no evidence in the tax court to show that the amount it paid to sponsor Gill's racing was customary or reasonable in amount The only evidence of what was customary and reasonable was the amount paid in the arm's-length transaction with Pringle. Consequently, the tax court's conclusion that the amount spent for Gill's racing were unreasonable, given the glaring disparity between that amount and the amount paid Pringle, is not clearly erroneous.
 
 
 15
 If a tax court determines that an expenditure is unreasonable, the so-called Cohan doctrine, Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir.1930), provides the tax court with discretion to estimate an allowable deduction if there is sufficient evidence to support the contention that the expenses were in fact incurred. See, e.g., Cinelli v. Commissioner, 502 F.2d 695, 699 (6th Cir.1974). The amount that the court determined was reasonable, and the resulting disallowance of deductions, is supported by ample evidence, and is not clearly erroneous.
 
 B.
 
 16
 After concluding that some of Quilting's expenditures for sponsoring Gill's race car driving were unreasonable, and disallowing those deductions, the tax court then turned to the question of whether those amounts "constitute constructive dividends to Gill," and concluded that they did. Before this court, Gill first renews his argument that the race car expenses are deductible in full, and thus cannot be treated as constructive dividends to him. Then, in the alternative, Gill argues that even those expenses that are not deductible were not constructive dividends. He contends that it was inconsistent for the tax court to hold, on the one hand, that the primary purpose for spending money on the race cars was for Quilting's benefit, as advertising, and to later hold that the excessive payments were constructive dividends, because, in order to be a constructive dividend, a payment must have been primarily for the benefit of the corporate stockholder.
 
 
 17
 Section 61(a) of the Internal Revenue Code defines gross income to include "all income from whatever source derived," including, under section 61(a)(7), receipt of a dividend. I.R.C. § 61. The Code defines a dividend as "any distribution of property made by a corporation to its shareholders." I.R.C. § 316(a). Whether Gill received the benefit the tax court has characterized as a constructive dividend is a question of fact, Hagaman v. Commissioner, 958 F.2d 684, 690 (6th Cir.1992), but whether the benefit, if received, is properly characterized as a constructive dividend is a question of law that we review de novo.
 
 
 18
 The fact that a corporation "may not have intended that ... payments be considered a dividend, and did not treat these payments as dividends on their books, ... does not prevent the payment from being considered a constructive dividend." Estate of DeNiro v. Commissioner, 746 F.2d 327, 330 (6th Cir.1984). It is well established that
 
 
 19
 [w]hen a corporation confers an economic benefit upon a shareholder, in his capacity as such, without an expectation of reimbursement, that economic benefit becomes a constructive dividend, taxable to the respective shareholder. This benefit is taxable to the shareholder whether or not the corporation intended to confer a benefit upon him.
 
 
 20
 Hagaman, 958 F.2d at 690 (citations omitted). Thus, "[c]orporate expenditures constitute constructive dividends only if 1) the expenditures do not give rise to a deduction on behalf of the corporation, and 2) the expenditures create 'economic gain, benefit, or income to the owner-taxpayer.' " P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th Cir.1987) (citations omitted).
 
 
 21
 Gill acknowledges that he personally owned the race cars in question, and that the sums paid by Quilting were for repairs to those cars. Plainly, the tax court's language relied on by Gill was meant to apply only to the amount of the expenditures that were reasonable; to the extent the expenditures were reasonable, then they were primarily for the benefit of Quilting. From the conclusion that some of those expenditures were un reasonable, however, follows inexorably the conclusion that those expenditures were not for the benefit of Quilting, but were instead largesse from the corporation to its sole stockholder, to wit, Gill. There is no error, clear or otherwise, in the tax court's determination that these payments were received by Gill and were properly chargeable to him as constructive dividends.
 
 C.
 
 22
 The tax court determined that Quilting was liable for an addition to its tax under I.R.C. § 6653(a)(1)(A) & (B) because part of its underpayment resulted from negligence. Quilting had argued that it was not negligent, because it had relied on an accountant, an argument that the tax court rejected with respect to certain tax decisions:
 
 
 23
 Respondent determined an adjustment to Quilting's cost of goods sold for its taxable year ended April 30, 1988, which Quilting has conceded. Shaw[, Quilting's accountant,] testified that the adjustment related to a change in the applicable tax law which became effective in 1986. Shaw admitted that he was aware of the change in the law but that he assumed, albeit incorrectly, that the change was taken into account in the inventory figures which he received from Quilting. However, Quilting supplied Shaw with erroneous information that Shaw used to prepare Quilting's return. Since the underpayment resulted from the erroneous data supplied to Shaw by Quilting, and Quilting has not shown that it was not negligent in preparing and furnishing those data to Shaw, we sustain respondent's determination with respect to the underpayment resulting from this error.
 
 
 24
 (Citations omitted) (emphasis added)
 
 
 25
 Implicitly conceding that it did indeed supply erroneous data to Shaw, Quilting argues that the errors were not Quilting's fault. It relied on Shaw for general business advice as well as tax advice, and it now contends that Shaw failed to inform Quilting of the enactment of certain uniform capitalization rules for inventory which required special treatment. Instead of inquiring about Quilting's inventory capitalization, Shaw assumed that the inventory costs which had to be capitalized were included in the capitalized inventory costs of Quilting. Quilting contends that it reasonably relied on Shaw's advice, thus relieving Quilting of any responsibility for the additional tax on the underpayment.
 
 
 26
 Section 6653(a)(1)(A) of the Internal Revenue Code imposes a penalty of 5% of a tax underpayment if any part of that underpayment is due to negligence or intentional disregard of the rules and regulations; section 6653(a)(1)(B) imposes an additional penalty of 50% of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of the rules and regulations. Quilting disputes only the latter interest-related component of the negligence penalty. Negligence is defined as "lack of due care or a failure to do what a reasonable person would do under the circumstances." Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir.1992). "The Commissioner's finding that an underpayment was caused by a taxpayer's negligence is presumptively correct, and the taxpayer who would have it overruled bears the burden of proving that he was not negligent." Illes v. Commissioner, 982 F.2d 163, 166 (6th Cir.1992), cert. denied, 113 SCt 1579 (1993), see Pasternak v. Commissioner, 990 F.2d 893, 899 (6th Cir.1993). The tax court's finding that Quilting failed to meet its burden of proving due care is a factual finding that this court reviews for clear error. Pasternak, 990 F.2d at 899.
 
 
 27
 "Good faith reliance on professional advice concerning tax laws is a defense" to the imposition of a penalty under section 6653. Chamberlain v. Commissioner, 66 F.3d 729, 732 (5th Cir.1995). "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." United States v. Boyle, 469 U.S. 241, 251 (1985) (emphasis omitted). In order to claim good-faith reliance on professional advice, however, Quilting needed to seek advice from a professional and reasonably rely on it. Illes, 982 F.2d at 166. Further, to escape a section 6653(a) penalty, a taxpayer must show that the accountant reached the subject decision independently after being fully apprised of the facts. Leonhart v. IRS, 414 F.2d 749, 750 (5th Cir.1969); see Stovall v. Commissioner, 762 F.2d 891, 895 (11th Cir.1985).
 
 
 28
 Quilting does not suggest that it was misinformed by Shaw's response to its question concerning how properly to capitalize its inventory; instead, as it conceded at oral argument, its contention is that Shaw failed to volunteer the relevant information, and that Shaw had an affirmative duty to do so. This argument fails. Since Quilting did not ask Shaw for the advice it claims it needed, it cannot claim that it relied on the non-advice that was forthcoming. Secondarily, it supplied Shaw with incorrect figures, which caused him to erroneously compute the tax due. There was no clear error on the part of the tax court in concluding that, under the circumstances, Quilting is not entitled to rely on a good-faith reliance defense.
 
 D.
 
 29
 Finally, the petitioners challenge the penalty imposed by the Commissioner for substantial understatement of income tax, pursuant to I.R.C. § 6661(a). The petitioners offer no substantive argument against the penalty, but argue only that the Commissioner "abused her discretion in failing to waive" the penalty under section 6661(c), which provides that the Commissioner can waive the penalty upon a showing that there was reasonable cause for the understatement, and the taxpayer acted in good faith. The tax court rejected the argument on the ground that
 
 
 30
 petitioners have not placed in the record documentation or other evidence establishing that they submitted to respondent at any time during their dealing with her representatives ... information relating to their reliance on an accountant that would show there was reasonable cause for those understatements and that they acted in good faith. Thus, assuming arguendo that petitioners requested a waiver that respondent refused to grant, the instant record cannot support a finding by us that respondent abused her discretion.
 
 
 31
 (Citations and footnote omitted.) The court noted, however, that "[t]he record is insufficient for us to decide whether or not Respondent considered and/or rejected a request for a waiver."
 
 
 32
 Conceding, on appeal, that they did not request a waiver from the Commissioner, the petitioners contend simply that they were under no obligation "to make some formal request for waiver of the penalty," and assert that "Respondent knew very well that Petitioners were seeking relief from the penalty," since they had alleged in their petitions that the penalty was in dispute.
 
 
 33
 For the period in question, section 6661 of the Internal Revenue Code imposed a penalty of 25% of the amount of any underpayment attributable to a "substantial understatement of income tax for any taxable year." I.R.C. § 6661(a). An understatement is the difference between the tax that should have been shown on the return and the tax that was actually shown. See id § 6661(b)(2). An understatement is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000 for individuals, and $10,000 for corporations. Id. § 6661(b)(1)(A).
 
 
 34
 Section 6661(c) authorizes the Secretary of the Treasury to waive the section 6661 penalty if the taxpayer shows that there was reasonable cause for the understatement and that the taxpayer acted in good faith. The statute makes waiver of the penalty discretionary. Mauerman v. Commissioner, 22 F.3d 1001, 1004 (10th Cir.1994). Thus, courts "review the ... decision to waive or allow the penalty to stand for abuse of discretion." McCoy Enterprises v. Commissioner, 58 F.3d 557, 562 (10th Cir.1995).
 
 
 35
 The Treasury Regulations promulgated under this statute provide that "if it was reasonable for the taxpayer to rely upon the advice of an accountant under the circumstances, and the taxpayer did so in good faith, then the Commissioner may waive the penalty." Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir.1991) (citing Treas.Reg. § 1.6661-6(b)). However, numerous cases have held that "[t]he Secretary does not abuse his discretion by refusing to grant a waiver that was never requested." Anderson v. Commissioner, 62 F.3d 1266, 1273 n. 13 (10th Cir.1995); McCoy Enterprises, 58 F.3d at 562-63; Reinke v. Commissioner, 46 F.3d 760, 765 (8th Cir.1995). As the Reinke court observed, "[s]ince [the taxpayer] never asked the Commissioner to waive the addition to tax, it is difficult to fault the Commissioner for failing to waive [the penalty]." Reinke, 46 F.3d at 765.
 
 
 36
 As the petitioners themselves concede, they failed to request a waiver of the penalty to which they object. It was not incumbent upon the Commissioner to, sua sponte, review the record before her to determine whether a waiver might arguably be inappropriate, and there was no abuse of discretion in her failure to undertake such a task.
 
 IV.
 
 37
 For the foregoing reasons, the judgment of the tax court is AFFIRMED.